**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
:
NEIL WOLFE,                          :
                                     :
                    Plaintiff,       :
                                     :
       v.                            :        Civil Action No. 17-1534 (ABJ)
                                     :
DEPARTMENT OF HOMELAND SECURITY,     :
                                     :
                    Defendants.      :
_____ :

## <u>MEMORANDUM OPINION</u>

Neil E. Wolfe ("plaintiff") has brought this action against the United States ("defendant") under the Federal Tort Claims Act ("FTCA"), *see* 28 U.S.C. §§ 2671–80. Defendant has moved for summary judgment [Dkt. 18], and for the reasons discussed below, the Court will grant defendant's motion. Plaintiff has simply not come forward with facts in response to defendant's motion that would create a genuine issue to present to a jury, and at this stage it is plaintiff's responsibility to do that.

At the beginning of this case, plaintiff was eager to have this set of facts investigated, and his advocacy accomplished that goal. And plaintiff has had the full opportunity he sought to take discovery and pursue his claims. The Court acknowledges that plaintiff sincerely believes that the officer's use of a Taser and the arrest were unjustified, and that the use of the Taser was painful. But applying the legal principles the Court is required to apply, and a fair consideration of the record in its entirety, leads to the conclusion that the officer's actions in using force while carrying out his duties were reasonable under the circumstances.

1

# I. BACKGROUND

## A. <u>The Million Mask March</u>

On November 5, 2014, a protest called the Million Mask March took place along Constitution Avenue N.W. in Washington, DC. Statement of Material Facts Not In Genuine Dispute ("Def.'s SMF") ¶ 1; *see* Resp. to Def. Statement of Material Facts Not In Genuine Dispute ("Pl.'s SMF") ¶ 2.[1] "The November 2014 Million Mask March was the second large scale event held in Washington, DC during the year, with hundreds of protesters/marchers trying to draw attention to various issues." Def.'s SMF ¶ 2; *see* Pl.'s SMF ¶ 2.

The Federal Protective Service ("FPS"), a component of the U.S. Department of Homeland Security ("DHS"), "is responsible for protecting federally owned and/or leased facilities to provide a secure environment for federal agencies and visitors to those facilities." Mem. of P. & A. in Support of Def.'s Mot. for Summ. J. ("Def.'s Mem."), Ex. 4 (Sultan Decl.) ¶ 1. Area Commander Darius Sultan and Inspectors Nathan Tillman ("Tillman"), Jason Patterson and Maurice Madison were among the FPS officers monitoring the protest. Def.'s SMF ¶ 3; Pl.'s SMF ¶ 3.

## B. <u>FPS Policy on Conducted Electrical Weapons</u>

"FPS policies permit the use of approved Tasers (also known as 'Conducted Electrical Weapons' or 'CEWs') by authorized FPS personnel 'if there is an immediate threat to the safety of the officers or others.'" Def.'s SMF ¶ 19; *see* Pl.'s SMF ¶ 19. Tillman was trained to use a Taser, and his certification to do so remained in effect on November 5, 2014. Def.'s SMF ¶ 20.

---

[1] Plaintiff's "Response to Defense Statement of Material Facts Not In Genuine Dispute" appears on pages 14-33 of his opposition to defendant's summary judgment motion.

Pursuant to FPS policy, any deployment of a Taser "must be individually justifiable under the 'Graham Factors,'" which include:

      a. The severity of the crime[,]

      b. Immediate threat to the safety of the officer or others,

      c. Actively resisting arrest, and

      d. Evading arrest by flight.

*See* Def.'s Mem., Ex. 14 ("CEW Policy Mem.") at 2 ¶ A.1. When feasible, a warning to the subject should precede CEW deployment. CEW Policy Mem. at 2 ¶ A.3. The "[s]everity of the crime and the extent that a fleeing subject poses a threat to the public must be considered when applying a CEW." *Id.* ¶ A.6.

    C. <u>Plaintiff's Arrest</u>

Plaintiff participated in the November 5, 2014 demonstration. Compl., Attach. A ¶ 1; *see* Pl.'s SMF ¶ 1. Tillman first observed plaintiff "standing on the steps in front of the . . . Internal Revenue Service building at 1111 Constitution Avenue with a large number of demonstrators," Pl.'s Mot. to Deny Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 30 ("Tillman Dep.") at 15:9-13; *see* Tillman Dep. at 79:21-80:1, 85:3-16, some of whom were "banging on the doors of the building." *Id.* at 85:15-16, 118:11-119:3. Tillman did not see plaintiff bang on the door, *see id.* at 118:22-119:3, 140:20-22, but he did observe plaintiff "yelling and shouting and encouraging the crowd." *Id.* at 141:13-14.

"What made [Tillman] notice [plaintiff] was the fact that [plaintiff wore] a camouflage Kevlar vest." *Id.* at 86:20-22; *see id.* at 10:1-3. The vest "did stand out," *id.* at 79:5, and Tillman thought that "[i]t's just not typical attire." *Id.* at 79:9. Plaintiff carried a "Gadsden Flag," Pl.'s Opp'n at 36, on "a 4-6' long 1/4' by 1 1/2' wooden pole," Compl., Attach. A ¶ 2, and he wore a Guy Fawkes mask and a battle dress uniform. *See* Pl.'s Opp'n at 11 (referring to Tillman Dep. at

102:8-103:16). Tillman also observed "a black canister," Tillman Dep. at 80:15, which he believed

to be a canister of oleoresin capsicum spray ("OC spray"), in the pocket of plaintiff's vest. *Id.* at

81: 6-7; *see id.* at 14:17-18, 15:7-13, 79:13-14, 87:3-4; Def.'s Mem., Ex. 3 ("First Tillman Decl.")

¶ 5. Tillman testified that the black canister was "similar to the type [police officers] carry or

similar to the type that is issued to [FPS officers]." Tillman Dep. (questions posed by plaintiff) at

80:16-18. Tillman considered both the OC spray, Tillman Dep. at 106:10-12, and the flagpole,

*id.* at 31:7-10, to be potential weapons. *Id.* at 81:21-82:1 ("It posed to me the fact that you had OC

spray that you may very well use against one of us."). As he explained at his deposition:

> Q [by Plaintiff]: Guys wearing a Guy Fawkes mask, let's throw a can of [OC] spray in there, Kevlar vest, BDUs, flag. Does that maybe – you don't want me to use the word "prejudice." Does that maybe give rise to some preconceived notions about what their behavior might be that day?
>
> A [Tillman]: I would anticipate some form of civil disobedience, yes, based on the attire.

Tillman Dep. at 103:8-16. Further, Tillman testified:

> Q: [A] guy that was dressed like I was that day [was] more in your category of you are going to watch that guy closer, you are going to feel like he is a potential threat more so than a guy dressed . . . in a tie and that sort of thing?
>
> A: That's correct because you have a weapon in your possession and he does not. And you also have what is perceived to be a ballistic vest.

*Id.* at 104:16-105:5.

Soon after he was first observed by Tillman, plaintiff saw a vehicle, a white Mercedes

Benz, strike a protester on Constitution Avenue, N.W. Compl., Attach. A ¶¶ 1-2; *see* Tillman Dep.

at 12:5-6, 21:9-10. Plaintiff believed this to be "a felony hit and run where [the driver of the

Mercedes] . . . had broken through/avoided police barriers and intentionally struck a female

demonstrator[.]" Compl., Attach. A ¶ 1. He approached two Metropolitan Police Department

("MPD") officers standing nearby "and offered his business card, as a witness to the [incident]." *Id*., Attach. A ¶ 2. The MPD officers directed plaintiff to Tillman, who had "stopped the Mercedes," Tillman Dep. at 12:1-2, "midway between 14th Street and 12th Street on Constitution Avenue." *Id*. at 13:7-8; *see id*. at 148:22-149:4.

A group of demonstrators, including plaintiff, ran towards the stopped Mercedes. *See id*. at 148:21-152:14. According to plaintiff, his initial contact with Tillman occurred "in the middle of 14th St[reet] which was blocked off to traffic at the time, with his business card in hand offering himself as a witness to [the] hit-and-run[.]" Pl.'s SMF ¶ 6. Tillman does not recall plaintiff's offering him a business card or throwing it down. Tillman Dep. at 22:9-23:10; *see* Am. Compl., Attach. A ¶ 2; Pl.'s SMF ¶ 6.

At the time of the encounter, Tillman thought that possession of OC spray was not legal at all, or at least, not in the quantity plaintiff possessed, under District of Columbia law. First Tillman Decl. ¶ 5; *see* Tillman Dep. at 24:22-26:22. He "wanted to "clarify whether or not . . . possession of [OC spray] was legal," Tillman Dep. at 26:1-3, and he consulted an MPD officer nearby, who informed him (apparently incorrectly) that possession OC spray was illegal. *See id*. at 38:9-39:3, 32:17-21. Tillman decided to conduct a "field interview" of plaintiff, *id*. at 32:8, and to take possession of the OC spray until he completed his investigation. *Id*. at 55:14-17. He was unable to do so because an "altercation" between the two ensued. *Id*. at 26:21-22.

The initial physical contact occurred when Tillman approached plaintiff, placed his hand on plaintiff's chest, held plaintiff at arm's length against a waist-high concrete planter, and ordered plaintiff to drop the flag and flagpole he was carrying. Def.'s SMF ¶ 6; Pl.'s SMF ¶ 6. The parties dispute whether Tillman actually pushed plaintiff backwards. Def.'s SMF ¶ 7; Pl.'s SMF ¶ 7. At his deposition, Tillman did not recall pushing plaintiff against the planter, Tillman Dep. at 33:19-

20, but he did recall placing his "hand on [plaintiff's] chest, *id*. at 30:14, and "trying to keep [plaintiff] there so [he] could come to a determination as to whether or not [plaintiff's possession of] OC was, in fact, legal[.]" *Id*. at 33:21-34:1. According to plaintiff, Tillman pushed him "using [a] forearm to [his] chest forc[ing] him out of the street onto the sidewalk and up against the concrete barrier[.]" Pl.'s SMF ¶ 7; *see id*. ¶ 4. Plaintiff refused to drop his flag, and he placed it atop the planter instead. Compl., Attach. A ¶ 2.

Tillman said to plaintiff, "give me the spray and you can walk." Def.'s SMF ¶ 7. Plaintiff refused. He set down the backpack he had been carrying, took papers out of his backpack and showed them to Tillman. *Id*. ¶ 8; First Tillman Decl. ¶ 5. According to Tillman, the papers were support for plaintiff's claim that he had "a right to defend himself with the OC spray." Def.'s SMF ¶ 8; First Tillman Decl. ¶ 5. According to plaintiff, he voluntarily presented the papers as "evidence that his life had been threatened to help Tillman better understand why he wore a defensive vest and carried defense spray[.]" Pl.'s SMF ¶ 8.[2]

"While Tillman was putting the papers back into plaintiff's backpack, plaintiff took off down Constitution Avenue, leaving his backpack behind." Def.'s SMF ¶ 8. Tillman did not follow him, First Tillman Decl. ¶ 5, and did not recall seeing plaintiff leave. *See* Tillman Dep. at 57:21-58:11, 59:14-18. Tillman "did place the backpack on a[n] FPS law enforcement vehicle for further inspection." First Tillman Decl. ¶ 5; *see* Pl.'s SMF ¶ 9. Meanwhile, other demonstrators were gathering around and becoming agitated. *See* Tillman Dep. at 121:21-123:15.

---

[2] Plaintiff alleged "that he and several of his demonstrating associates had received specific threats on social media from a 'red mask' faction that threatened the use of firearms against [him] and his associates on the day of the demonstration." Compl., Attach. A ¶ 3. He described the papers he showed Tillman as "printed copies [of] the threats[.]" *Id*., Attach. A ¶ 3; *see* Tillman Dep. at 36:18-38:4.

Roughly one minute after plaintiff walked away, he returned to the area and approached his backpack, Def.'s SMF ¶ 9, which either remained on the hood of an FPS vehicle, Pl.'s SMF ¶ 9, or had been placed on the ground beside the vehicle. Def.'s SMF ¶ 9. When plaintiff grabbed the backpack, Tillman "pull[ed] back on the other end of the backpack," effectively "pull[ing] the plaintiff towards hi[m]." Pl.'s SMF ¶ 10; *see* Def.'s SMF ¶ 10 ("As he went for the backpack, Plaintiff collided with Tillman[.]").

According to Tillman, "[w]hile attempting to get his backpack [plaintiff] struck [him.]" First Tillman Decl. ¶ 6 Tillman testified that plaintiff struck him first on his hand or wrist, *see* Tillman Dep. at 52:20-53:7, 61:15-18, prompting him to try to grab plaintiff's hand, after which plaintiff intentionally struck Tillman multiple times. *See id.* at 61:15-64:2, 64:11-65:19. Tillman decided to arrest plaintiff for assault, *see id.* at 66:10-13, and as he reached for plaintiff's arm, plaintiff struck him again. *Id.* at 63:20-22.

Plaintiff characterized this brief tussle, Def.'s SMF ¶ 10, as his "attempt to, while retreating, [to] prevent yet another unlawful assault by Tillman who repeated[ly] attempt[ed] to grab" his arm. Pl.'s SMF ¶ 10. Plaintiff does not deny striking Tillman; he claimed that he was defending himself, "repelling Tillman's unlawful assault by pushing Tillman's hands away from him." Pl.'s SMF ¶ 11. Tillman and plaintiff then backed away from each other. Def.'s SMF ¶ 11.

At that point, Tillman drew his Taser with his left hand and pointed it at plaintiff. *Id.* At his deposition, Tillman explained:

> What prompted me to draw my Taser was the fact that you assaulted me. And the fact that there were numerous demonstrators behind you, given your size and the fact that you had on the flak vest and a can of OC.

Tillman Dep. at 121:2-6. Tillman further testified:

> To the best of my recollection, given the scenario of over 200 people running in my direction with sticks in their hands, one individual in particular had on a Kevlar vest, for some unknown reason, with a large amount of oleoresin capsicum spray.
>
> Not knowing their intents, observing some of the demonstrators possibly banging on the white Mercedes that was stopped and try to get them to safety, worried about my own safety and my partner's safety, I have to take all the measures I can to ensure that I am safe.
>
> I know I am outnumbered probably that day seven to one or more. I have no idea who is behind me or around me because I'm focused on what I perceive may be a possible threat that's in front of me.

Tillman Dep. at 113:9-114:5.

Tillman ordered plaintiff not to touch the OC spray. Def.'s SMF ¶ 11; Pl.'s SMF ¶ 12; *see* Tillman Dep. at 115:5-22. He told plaintiff "that he was under arrest for assaulting a police officer and instructed him to raise his hands." First Tillman Decl. ¶ 6. Plaintiff raised his hands in the air initially, and promptly lowered them. Def.'s SMF ¶ 12; Pl.'s SMF ¶ 12; First Tillman Decl. ¶ 6. Tillman believed plaintiff's hands were "going in the direction of the OC." Tillman Dep. at 120:16-17. Then he deployed the Taser. *See id*. at 125:22-126:10; Def.'s SMF ¶ 13; First Tillman Decl. ¶ 7.

Tillman was asked about his actions at his deposition:

> Q:      Then can you tell me what prompted you to pull the trigger on the Taser because you did not pull the trigger immediately.
>
> A:      The fact that your hand moved toward the OC after I had given you several commands not to touch it.

*Id*. at 125:22-126:6; *see id*. at 127:17-18 ("When your hand moved towards it, that is what prompted me to discharge my Taser."). "At the time [Tillman] made the decision to tase the plaintiff, [he] believed that [plaintiff] posed a danger to [himself], other law enforcement officer[s]

and members of the public participating in or observing the demonstration."  First Tillman Decl. ¶ 7.[3]

One prong of the Taser stuck plaintiff in his upper leg or thigh; the other appeared to have lodged in his flak jacket.  Def.'s SMF ¶ 13; *see* Compl., Attach. A ¶¶ 6, 8.  The Taser had the intended effect: plaintiff was stunned and fell to the sidewalk.  *Id*.  He rose to his feet after "a few seconds."  Def.'s SMF ¶ 13.  "[P]laintiff thought he had one of the prongs in his hand and [threw] it back in [Tillman's] direction."  Pl.'s SMF ¶ 13.  Plaintiff also threw the OC spray canister at Tillman.  *See id.*; Tillman Dep. at 115:2-4.  Tillman pointed the Taser at plaintiff again, at which time plaintiff raised his hands, Def.'s SMF ¶ 15, and otherwise "complie[d] . . . with the arresting officers."  Pl.'s SMF ¶ 13.  Tillman arrested plaintiff "for possession of an illegal self-defense spray and assaulting a federal officer."  Def.'s SMF ¶ 15; First Tillman Decl. ¶ 8; Def.'s Mem., Ex. 10 (Arrest/Prosecution Report).

Plaintiff alleged that Tillman improperly removed the taser prong from his leg, Compl., Attach. A ¶ 8, and tightened the handcuffs so that they "were cutting off his circulation."  *Id*., Attach. A ¶ 7.  In addition, plaintiff alleged that, while he was in handcuffs, an unidentified police officer "pressed the top [of plaintiff's] left hand upwards, bending at the wrist and causing excruciating pain[.]"  *Id*., Attach. A ¶ 9.  However, none of the FPS officers on the scene "witness[ed] any FPS officers perform such a [submission] maneuver," Def.'s SMF ¶ 16, and plaintiff proffered no evidence to show that any officer employed a submission move, Pl.'s SMF

---

[3] The parties both note that bystanders were agitated.  Tillman testified that the crowd was agitated during the entire encounter, *see* Tillman Dep. at 123:5-15, becoming even more agitated after the tasering, *see id*. at 123:8.  Plaintiff attributed the crowd's agitation to Tillman's pointing of the Taser.  *See generally* Pl.'s SMF ¶ 11.

¶ 16.  Plaintiff did not sustain any significant or permanent physical injury as a result of his encounters with Tillman.  Def.'s Mem., Ex. 13 (Pl.'s Resp. to Interrog. No. 8); Pl.'s SMF ¶ 18.

D. <u>The Criminal Charges</u>

"[P]laintiff was . . . taken to the DC overnight lockup[.]"  Compl., Attach. A ¶ 11.  The charge of illegal possession of self-defense spray was dismissed for want of prosecution on February 10, 2015.  Def.'s SMF ¶ 17; Pl.'s Opp'n, Ex. 33 (Docket Sheet, 2014 CDC 019496).  "The charge of assault on a police officer was disposed of *nolle prosequi* after Plaintiff completed pre-trial diversion."  Def.'s SMF ¶ 17; Pl.'s Opp'n, Ex. 33 (Docket Sheet, 2014 CMD 019455).

E. <u>Defendant's Expert Witness</u>

Defendant has presented expert testimony on the reasonableness of Tillman's use of force.  David G. Powderly is "a use of force expert . . .[f]or the Federal Protective Service," Pl.'s Opp'n, Ex. 31 ("Powderly Dep.") at 8:11-14, and "master Taser instructor."  Powderly Dep. at 76:18.  He has "over 27 years of federal law enforcement experience, 17 of which [he spent] training other law enforcement officers on the use of force, . . . includ[ing] the use of [CEWs]."  Def.'s Mem., Ex. 1 ("Powderly Report") at 2.   He is familiar with "the *Graham* factors," *id.*, referencing the Supreme Court opinion in *Graham v. Connor*, 490 U.S. 386 (1989), and its "non-exhaustive list of factors," Powderly Report at 3, for determining whether an officer's use of force is objectively reasonable:

- the severity of the crime at issue

- whether the suspect poses an immediate threat to the safety of the officers or others

- whether he is actively resisting arrest or attempting to evade arrest by flight

*See id.* Powderly bases his opinion in part on review of three video recordings, *see* Def.'s Mem., Ex. 8 (Video Files), among other materials, *see* Powderly Report, Appendix 1 (Materials Relied Upon).[4]

According to Powderly, Video No. 1 showed plaintiff's attire, and the canister believed to be OC spray was clearly visible in plaintiff's vest pocket. Powderly Report at 4. It also showed Tillman's first encounter with plaintiff, during which Tillman examined the papers plaintiff presented. *Id.* at 5. No physical contact between the two was recorded in the first 13 seconds in the video. Plaintiff had departed the area, leaving his backpack behind "but . . . still carrying the OC spray." *Id.* Powderly deemed the OC spray "dangerous to an officer if used against [him]," *id.* at 4, "especially [because] its effects are immediate in most cases," *id.*, and they include "burning and inflamed eyes, involuntary closing of the eyes, thus, hindering the officer's vision," *id.*

Video No. 1 also recorded the second encounter, which Powderly described as follows:

> Video No. 1, at time 0:14 picks up the second encounter between . . . Tillman and the plaintiff. The plaintiff is standing on the sidewalk area approximately 4 or 5 feet from the curb . . . . This puts the total distance between . . . Tillman and the plaintiff at approximately 6 to 7 feet from each other. This distance . . . is known as the reactionary gap. The closer the individual is to an officer, the less time an officer has to react to a specific threat. I also noticed that there was no barricade or obstacle between the two individuals, in which to slow any movement from [Plaintiff] toward . . . Tillman. Based on this, even with . . . Tillman having his Taser out and extended, the two are close enough to each other that . . . Tillman would not have enough time to react . . . .

---

[4] Exhibit 8 to defendant's memorandum is a disc with the three video recordings. Plaintiff raises no objection to the videos, and appears to have supplied them to defendant, *see* Tillman Dep. at 69:17-18 (plaintiff stating that he submitted videos to defendant's counsel) and to rely on them, too. *See* Pl.'s Opp'n at 3, 37, 52; *see id.*, Ex. 28. The videos are part of the undisputed record, and Powderly's accounts are consistent with the Court's review of the materials.

Video No. 1 at 0:14 shows the plaintiff with both arms down to his side in a flexed fighting position. It is also noted here that the gloves the plaintiff is wearing have what appears to be plastic covering the knuckles, which [is] known to me to also have some type of padding under the plastic to reduce possible injury to the wearer[']s hand when delivering a strike or to protect [his] hand from other injuries if st[r]uck on the hand. Based on this, I would take these signs as possible pre-assault indicators that an individual [poses] a possible immediate threat to an officer.

Video No. 1 at 0:15 shows the plaintiff look in the direction of his OC spray on his right side pocket of his Flak jacket and both hands begin to rise in the direction of the OC spray. Video No. 1 at 0:16 shows the plaintiff with both his hands on his OC spray at which time (0:17) . . . Tillman deploys the Taser.

*Id.* at 5.

Video No. 2 recorded the second encounter from a slightly different vantage point, behind and to the right of plaintiff. *Id.* at 6. It showed plaintiff's "right forearm . . . on or against . . . Tillman's chest and his left hand 'open palm' touched . . . Tillman's shoulder." *Id.* Tillman and plaintiff separated when "Tillman pushed the plaintiff off of him and creat[ed] space between them, but still within arm's length as . . . Tillman appears to grab the plaintiff's left arm[.]" *Id.* Roughly two seconds later, "plaintiff [was] seen swinging his right arm in [Tillman's] direction . . . and striking . . . Tillman in the left chest area with an open hand palm strike." *Id.* Plaintiff then was "seen raising his hands above his head, as . . . Tillman step[ped] back and [drew] his Taser and point[ed] it the plaintiff." *Id.* Powderly estimated that the two were "approximately five to six feet" apart, "which . . . is inside the safe reactionary gap, limiting . . . Tillman's options." *Id.* Plaintiff was seen falling backwards after having been struck by the Taser prongs, and was seen standing up roughly five seconds later. *Id.*

Based on Video Nos. 1 and 2, Powderly opined:

It is clear to me that when [Tillman] first encountered the plaintiff, . . . Tillman knew that he was dealing with an active demonstrator in the Million Mask March and member of the group Anonymous who

was non-compliant, refusing commands, armed with a wooden pole and OC spray, which . . . Tillman believed to be illegal. Both the wooden pole and the OC spray could be considered dangerous to an officer if used against [him]. This is especially true of the OC as its effects are immediate in most cases, such as burning and inflamed eyes, involuntary closing of the eyes, thus, hindering the officer's vision. OC also causes inflammation and swelling of the mucous membranes, coughing, gagging, gasping or burning sensation of the throat and lungs. Depending on the delivery system used of the OC (stream, full cone pattern, or fog), other officers and members of the public in the immediate area may also be contaminated and would have been similarly affected . . . . Based on this information and the totality of the circumstances, it is reasonable that . . . Tillman perceived the plaintiff as a potential threat and also that Tillman found it necessary to temporarily incapacitate the plaintiff through use of the Taser.

*Id*. at 4 (footnote omitted).

Video No. 3 "showed more of the first encounter [between plaintiff and] Tillman where [Powderly] could see more of the demeanor of the plaintiff," Powderly Dep. at 69:6-9, "as being more noncompliant and argumentative regarding the canister of the OC and complying with verbal commands." *Id*. at 69:11-13; Def.'s Mem., Ex. 2 ("Supp. Powderly Report") at 1. Tillman was "heard giving verbal commands, 'Stand right there', and two separate commands to 'Drop the Flag.'" Supp. Powderly Report at 1. Plaintiff responded, 'It's my Fucking flag, I'm not dropping it,' and then hands it off to another participant[.]" *Id*. Powderly observed plaintiff's conduct for the opening minutes of the video and considered him "non-compliant at times and confrontational as he tried to tell [Tillman] directly what he can and cannot do." *Id*. at 2. Video No. 3 further showed Plaintiff "turn[] and jog[] away . . . leaving his backpack" behind, only to "approach[] the rear of the FPS Police marked Chevy Tahoe" on the hood of which was plaintiff's backpack. *Id*. Plaintiff sped up and took "quick steps" towards the Tahoe, *id*., as if he were "intent on trying to snatch the backpack," *id*. Powderly "did not see or hear [plaintiff] ask permission nor was [he]

given permission to take the backpack[.]" *Id.* Video No. 3 also showed the "physical confrontation" between plaintiff and Tillman and the point at which Tillman drew his Taser. *Id.*

Video No. 3 served to "support[] and validate[] [Powderly's] earlier opinion that the plaintiff's actions were reasonably viewed by . . . Tillman as an immediate threat to himself, and to the other officers and members of the public in the immediate vicinity of the encounter." *Id.* at 2; Powderly Dep. at 69:2-3. Powderly concluded that "Tillman's use of the Taser was authorized based on FPS policy and training and was a reasonable use of force under the law." Supp. Powderly Report at 2.

F. Plaintiff's FTCA Claim

Plaintiff submitted a claim under the FTCA to DHS on or about May 5, 2016. Compl., Ex. (Standard Form 95, Claim for Damage, Injury, or Death). DHS denied his claim in January 2017. *Id.*, Attach. A ¶ 16. Plaintiff filed this civil action on July 31, 2017. *See* Compl. at 1.

**II. DISCUSSION**

A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.[5]

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, the Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

B. Plaintiff's Assault, Battery and False Arrest Claims are Cognizable Under the FTCA

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Congress may waive the federal government's sovereign immunity, but the waiver must be "unequivocally expressed[.]" *United States v. Nordic Village Inc.*, 503 U.S. 30, 33 (1992) (citations omitted); *see Webman v. Fed. Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006) ("Congress need not use magic words to waive sovereign immunity, but the language it chooses must be unequivocal and unambiguous."). The FTCA is a limited waiver of sovereign immunity which "renders the United States subject to suit for certain – but not all – tort claims." *Atherton v. United States*, 174 F. Supp. 3d 359, 363 (D.D.C. 2016), *aff'd sub nom. Atherton v. Jewell*, 689 F. App'x 643 (D.C. Cir. 2017); *Johnson v. Veterans Affairs Med. Ctr.*, 133 F. Supp. 3d 10, 15 (D.D.C.

---

[5] Plaintiff was appropriately advised of the summary judgment standard and the rules that would be applied by order dated December 21, 2018 [Dkt. 19].

2015) (stating that the FTCA "makes the federal government liable to the same extent as a private individual for certain torts of federal employees acting within the scope of their employment"). It "provides the exclusive remedy for common law tort claims against the United States." *Frazza v. United States*, 529 F. Supp. 2d 61, 69 (D.D.C. 2008) (citations omitted).

The FTCA's "'law enforcement proviso[]' . . . extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the 'acts or omissions of investigative or law enforcement officers.'" *Millbrook v. United States*, 569 U.S. 50, 52-53 (2013) (quoting 28 U.S.C. § 2680(h)). For purposes of the FTCA, an "investigative or law enforcement officer" is "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). The parties do not dispute that, "[a]t the time of the incident, . . . Tillman was operating as an FPS law enforcement officer under his 40 U.S.C. § 1315 authority." Def.'s Mem. at 11. Nor is there any dispute that Plaintiff's assault, battery and false arrest claims are cognizable under the FTCA by virtue of the law enforcement proviso.

C. Assault and Battery

"Tort liability under the FTCA is determined according to the law of the place where the alleged acts or omissions occurred – in this case, the District of Columbia." *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 911 (D.C. Cir. 2015) (citation omitted). "In the case of assault and battery, a plaintiff can recover for assault by proving 'intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff,' and for battery by proving an 'intentional act that causes harmful or offensive bodily contact.'" *District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003) (quoting *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997)).

Police officers "have a qualified privilege to commit [assault and battery] when using 'reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary.'" *Harris*, 776 F.3d at 913 (quoting *Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006) (quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993))); *see Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008) (noting that a police "officer must have some justification for the quantum of force he uses"). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Harris*, 776 F.3d at 913 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Defendant's summary judgment motion should be denied "only when . . . a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Id.* (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993)).

Defendant argues that Tillman's use of force was objectively reasonable in the circumstances of his encounter with plaintiff on November 5, 2014, and that the level of force employed was consistent with generally accepted police practices. *See generally* Def.'s Mem. at 13-18. Defendant supports its position with Powderly's expert opinion, which would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(2). Powderly found:

> With respect to the plaintiff's possession of the OC spray, . . . Tillman had a reasonable belief, based on information provided by local law enforcement, that possession of OC spray was illegal in DC. While the severity of this crime was minor, the OC itself presented a significant and immediate threat to the safety of the officers and bystanders present, considering the effects of OC spray if used against them. With respect to the assault on a Federal Police Officer, the severity of the crime is significant, as assault on law enforcement officer is a serious felony under DC and Federal law. Given the fact that the plaintiff had already demonstrated a willingness to refuse verbal orders, was carrying a chemical agent (OC), and that he had become violent by engaging in a physical

confrontation with a law enforcement officer, it is clear that he presented an immediate threat to Tillman and the other officers and bystanders in the area. Likewise, the plaintiff's prior behavior suggested that he would continue to actively resist arrest or attempt to evade arrest by flight.

Powderly Report at 3. Plaintiff did not designate an expert of his own, and he fails to rebut Powderly's proffered testimony.

Powderly also found that Tillman aimed the Taser at plaintiff's lower abdomen area in a manner "consistent with FPS training as the preferred target area when an individual is facing" the officer. *Id*. at 5. He explained:

> The X26 CEW Taser that . . . Tillman used produces a red dot laser for the point of aim of the top probe of the cartridge. The cartridge attached to the front of the Taser propels two separate probes with the top probe following the laser point. The second or bottom probe is propelled at an eight degree downward angle for a distance spread of the two probes of one foot spread for every seven feet of distance of travel. With the Taser aimed at the lower abdomen, at the distance that . . . Tillman is from the plaintiff, the two darts will "split the hemispheres" or have the top dart above the belt line and the bottom dart below the belt line to achieve the desired neuromuscular incapacitation . . . by contracting different and larger muscle groups.

*Id*. at 5-6 (footnote omitted). In the video, the bottom prong of the taser was seen in plaintiff's thigh; Powderly suspected that the top probe was embedded in plaintiff's flak jacket. *Id*. at 6.

Evidence presented by the parties includes three video recordings which depict two encounters between Tillman and plaintiff, each involving physical contact. Tillman initially approached plaintiff based on his mistaken belief that OC spray is illegal in the District of Columbia. During this first encounter, Tillman's placed his hand and/or forearm on plaintiff's chest when plaintiff was backed up against a concrete planter. Plaintiff immediately challenged Tillman, defiantly asserting his right to protect himself with OC spray and refusing Tillman's demands that he drop his flag and hand over the OC spray – both of which Tillman feared could

be used as weapons at that time. Powderly deemed plaintiff's actions "non-compliant at times and confrontational," Powderly Report at 2, based on plaintiff's "actions and tone of voice." *Id*.

At the time of the second encounter, plaintiff still had possession of the OC spray. He had already shown that he would not necessarily obey verbal commands, and he engaged in a physical confrontation with Tillman. According to defendant's expert, Tillman reasonably could have believed that plaintiff posed a threat that he would injure the officers or others by discharging OC spray. Although plaintiff initially complied with Tillman's command to raise his hands in the air, plaintiff promptly lowered his hands, moving them in the direction of the pocket holding the OC spray canister. Powderly notes that Tillman reasonably could have understood this movement to be an attempt to retrieve the OC spray for the purpose of discharging it, potentially harming Tillman, plaintiff himself, or the bystanders who had gathered around.

A police officer "may commit what at common law would be an assault unless the . . . use of force is clearly excessive." *Armbruster v. Frost*, 962 F. Supp. 2d 105, 117 (D.D.C. 2013) (internal quotation marks and citations omitted). Based on a review of the record in its entirety, including the videos, the expert's reports, and deposition testimony of the witnesses, the Court concludes that, from the perspective of a reasonable law enforcement officer, Tillman's deployment of the Taser in the circumstances of his encounter with plaintiff was objectively reasonable. Tillman was facing a non-compliant, verbally aggressive protester who had already engaged in a physical confrontation with a uniformed law enforcement officer. It was reasonable for Tillman to have perceived an immediate threat that plaintiff might discharge harmful OC spray in the midst of a crowd. This was dangerous even if the mere possession of OC spray was lawful. And, based on plaintiff's prior behavior, Tillman reasonably could have believed that plaintiff would resist arrest or flee to avoid arrest. Thus it was reasonable for Tillman to use force –

deployment of a Taser – to subdue plaintiff, *see Lash v. Lemke*, 786 F.3d 1, 7-8 (D.C. Cir. 2015), and the record demonstrates that Tillman did so in a manner consistent with generally accepted police practices. This is not a case where "a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Harris*, 776 F.3d at 913. Thus, the officer's actions are privileged, and the Court will grant summary judgment in favor of defendant.

### D. False Arrest

"In order make out a claim for unlawful arrest, [plaintiff] must allege an 'unlawful deprivation of freedom of locomotion for any amount of time, by actual force or a threat of force.'" *Lane v. District of Columbia*, 72 F. Supp. 3d 215, 224 (D.D.C. 2014) (quoting *Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978)), *aff'd*, 887 F.3d 480 (D.C. Cir. 2018). "An arrest is unlawful when there is no probable cause for that arrest." *Id*.

"Generally, probable cause exists where the facts and circumstances within the arresting officer's knowledge, of which he had reasonably trustworthy information, are sufficient in themselves to warrant a reasonable belief that an offense has been or is being committed." *Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014) (quoting *Rucker v. United States*, 455 A.2d 889, 891 (D.C. 1983)). In determining whether an officer has probable cause to arrest, the Court "draws all inferences regarding probable cause in favor of the non-moving party, but considers the information that was available to the arresting officer from the perspective of that officer." *Lane*, 72 F. Supp. 3d at 224 (citing *Bradshaw v. District of Columbia*, 43 A.3d 318, 324 (D.C. 2012)).

A police officer accused of false arrest "may defend on the merits by proof . . . that the arrest was made in good faith, with probable cause, under a statute he reasonably believed to be

valid." *Wade v. District of Columbia*, 310 A.2d 857, 862 (D.C. 1973) (citing *Pierson v. Ray*, 386 U.S. 547 (1967)); *see Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009); *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) ("A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." (citation omitted)). "The issue of probable cause in a false arrest case is a mixed question of law and fact that the trial court should ordinarily leave to the jury," and "[o]nly where the facts are undisputed or clearly established does probable cause become a question of law for the court." *Amobi*, 755 F.3d at 990 (quoting *Bradshaw*, 43 A.3d at 324).

### a. Possession of OC Spray

In the District of Columbia, "a person may possess and use a self-defense spray in the exercise of reasonable force in defense of the person or the person's property only if it is propelled from an aerosol container, labeled with or accompanied by clearly written instructions as to its use, and dated to indicate its anticipated useful life." D.C. Code § 7-2502.13. There is no dispute that possession of OC spray is permitted under District of Columbia law, *see id.*, and that Tillman was mistaken in believing plaintiff could not lawfully possess it. Plaintiff emphasizes this point, faulting Tillman for his lack of knowledge of District of Columbia law, *see, e.g.,* Pl.'s Opp'n at 1-2, 8, and for his failure to clarify the legality of OC spray before stopping him and charging him with a crime. *See id.* at 54; Pl.'s SMF ¶ 5. Further, plaintiff contends that Tillman charged him with a crime knowing it to be "bogus, . . . to create a justification for" Tillman's assaults on plaintiff. Pl.'s SMF ¶ 15. Aside from his own conclusory assertions, plaintiff produces no evidence to support his allegation that Tillman did not simply make a mistake.

Meanwhile, defendant has put forth unrebutted evidence that supports a finding that Tillman, in good faith, held a reasonable belief that OC spray was illegal in the District. Tillman's

mistake does not render plaintiff's arrest for possession of OC spray unlawful. *See Pointer v. District of Columbia*, 736 F. Supp. 2d 2, 7-8 (D.D.C. 2010) (concluding that MPD officer who reasonably but mistakenly believed that disqualified commercial license was not valid for the operation of a passenger vehicle with "the facts and circumstances within [the officer's] knowledge at the time of the arrest were sufficient to give him the necessary probable cause to effectuate an arrest"); *see Wade*, 310 A.3d at 862. Furthermore, a police officer is not obligated to "rule out" the validity of a suspect's claims of innocence prior to arresting him. *See Wesby*, 138 S. Ct. at 588 (noting that "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts"). And in any event, the officer had a basis to arrest plaintiff on other grounds.

### b. Assaulting a Police Officer

Simple assault under District of Columbia law is "(1) an act on the part of the accused (which need not result in injury); (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the act is committed." *Smith v. United States*, 843 F.3d 509, 512 (D.C. Cir. 2016) (quoting *Ruffin v. United States*, 642 A.2d 1288, 1295 (D.C. 1994)). Assault on a police officer has an added element – that the accused "knew or should have known the victim was a police officer." *Id*. (citation omitted).

The parties agreed that plaintiff made physical contact with Tillman as he attempted to retrieve his backpack. The videos reflect that plaintiff pushed or shoved the officer; this was not some sort of accidental contact. Also, it was apparent that Tillman was a law enforcement officer, and plaintiff does not dispute that knew Tillman to be one. Assaulting a police officer is a criminal offense, *see* 18 U.S.C. § 111(a), and Tillman had probable cause to arrest plaintiff and charge him with assault.

**III. CONCLUSION**

Defendant has demonstrated that Tillman's actions in using a Taser were privileged because he used a reasonable amount of force in protecting himself and others and in effecting plaintiff's arrest, and that he had probable cause to arrest the plaintiff. Accordingly, plaintiff's tort claims fail, and summary judgment will be granted in defendant's favor. An Order is issued separately.

DATE: September 27, 2019                    /s/
                                            AMY BERMAN JACKSON
                                            United States District Judge